James S. Brown, J.
The respondent, Manuel J. Steinberg, caused to be filed with the Board of Elections of the City of New York a designating petition containing 6,682 signatures to place his name on the Democratic primary ballot for the Democratic primary election, wherein he seeks to be elected as one of the' five candidates of that party for the office of Justice of the City Court of the City of New York, County of Kings.
After canvass by the Board of Elections 3,016, or 45% of the 6,682 signatures, were found to be invalid for various reasons, leaving 3,666 signatures which the Board of Elections has found valid.
This proceeding brings up for review the validity of those 3,666 signatures. Since the findings of the Board of Elections are presumptively correct, petitioners have the burden of proof.
The petition contains 753 numbered pages. As required by section 135 of the Election Law, each sheet bears the signature of an alleged subscribing witness.
The petitioner called more than 50 witnesses, including 18 subscribing witnesses. The testimony thus adduced destroyed entirely the credibility of those 18 subscribing witnesses as well as the credibility of 5 additional subscribing witnesses .who did not testify. It disclosed that many of them certified signatures not signed before them; that alterations were made after the signers signed; that many signatures certified by these subscribing witnesses were forgeries; that signatures were obtained *887 promiscuously without the subscribing witnesses knowing the people who signed; that petition sheets were handed around at random; that some subscribing witnesses’ statements were signed in blank before they were filled in; that many petitions were signed by the subscribing witnesses and delivered to the candidate’s headquarters and left there before the dates and district numbers were filled in, and that some of the dates were wrong. One of the subscribing witnesses even admitted that she did not sign her name either as a signer or as a subscribing witness but that someone else had signed her signature. Another subscribing witness encouraged a signer to sign his wife’s name while he was signing his own. Another subscribing witness, a sister of the candidate, who turned in 66 sheets with 655 names, admitted that she solicited and procured them in stores, banks, a hospital, a ferryboat, at the beach, at a golf course and on streets and avenues. When shown several sheets she could not recall where she obtained the signatures or how she came to know the people, although she insisted that she had been introduced to ‘1 many of them. ’ ’ It is interesting to note that 9 of the sheets of this subscribing witness all bear the date August 10,1959 alongside the signatures while 10 more have August 11, 1959 as the date when the signers signed, and the dates of her signatures as subscribing witness corresponded. The addresses of the signers on those 19 sheets are in many different Assembly Districts.
Another subscribing Avitness, not ImoAving that her own brother had testified the day before that he had procured 10 names for her and out of her presence, testified very definitely that she had obtained all the names on that particular sheet.
One Evelyn Strum, a member of the Candidates’ Committee on Vacancies, was called and testified that she had been at the campaign headquarters every night that it was open, which was five or six nights a week; that she took a most active part in processing petitions delivered or sent in by subscribing witnesses. She explained that Avhen a petition Avas received the subscribing witness was asked for the dates Avhen the signers signed. The dates were then filled in. The sheets were passed on to others to have the Assembly and Election Districts filled in. Then other workers took those sheets and checked them against enrollment records. She admitted that many changes were made after subscribing witnesses had subscribed and left. Her attention was called to various sheets whereon her initials “ ES ” appeared alongside corrections and she said that they probably indicated that the corrections were made after the subscribing witness had departed. She also admitted to making *888 corrections on petitions of subscribing witnesses whom she had never met or seen.
Albert Osborn, the handwriting expert, testified that after comparing the alleged signatures of two of the afore-mentioned 23 subscribing witnesses on petition sheets with their own valid signatures on their election enrollments, he was of the definite opinion that the signatures as subscribing witnesses were not theirs. Parenthetically, after inspection of the signatures that was all too obvious to the court, too. There was read to Mr. Osborn a list of 254 of the 753 pages of the petition and he testified that he had examined those pages, as well as many others. He then said that on each of those 254 pages, the dates written alongside the names of the signers were all written by one person and were all of the same date. For example, on one page the 10 names would have alongside each one the date ‘1 July 30th ’ ’ and each of those dates would be in identical handwriting. On another the dates would be “August 4th” and they too would all be in one handwriting; and on another ‘ ‘ August 11th ’ ’ and so on. This was true of 254 pages. He said that some of these dates appeared to be in the handwriting of the subscribing witness but that most were written by someone else. It taxes one’s credulity to believe that those dates were on when the signers signed or to believe that all 10 names were signed on the same date.
In going over all the 753 sheets the court found numerous other corrections and other initials besides those of Evelyn Strum or a subscribing witness. Such casual scrutiny also disclosed the interesting fact, previously found by the Board of Elections, that on 74 sheets each of the subscribing witnesses acted as the subscribing witness to his own signature; and at least two of them also signed other sheets of other subscribing witnesses, not bothering however to strike out their first signatures. Whether there were additional repetitions the court does not know.
Section 135 of the Election Law provides that a designating petition must set forth “ in every instance the full name of the signer, his residence * * * election district * * * and the date when the signature is affixed ’ ’ and in the City of New York it must also state the Assembly District. It also provides that ‘ ‘ A signer need not himself fill in the date, residence, ward, election district, town or city or assembly district.”
Said section also provides the form to be substantially followed and provides that the statement of the subscribing witness at the bottom of each sheet declare: “ I know each of the voters whose names are subscribed to this petition sheet containing *889 -signatures and each of them subscribed the same in my presence and upon so subscribing declared to me that the foregoing statement, made and subscribed by him, was true. ’ ’ Such a statement is at the bottom of each page of the petition in question.
Although the statute permits someone other than the signer to fill in the date and the district numbers, nevertheless those dates must be accurate and the signatures must be proved to have been signed on the dates set forth in the petition and any deviation from that,rule renders the petition invalid (Matter of Nunley, 258 App. Div. 746). See, also, New York Election Law by Lewis Abrahams (pp. 153-154): “ Altho the statute provides that the dates affixed to signatures may be supplied by others than the signatories, they must under the circumstances be correct. The component part of the petition wherein the signatory states: ‘ In witness whereof, I have hereunto set my hand the day and year placed opposite my signature, ’ should be strictly adhered to in the interests of regularity and safety, which necessitates that the date be affixed to the petition simultaneously with the signing thereof.” (Italics supplied.)
In his 1954 supplement to his work, at page 35, Mr. Abrahams in discussing irregularities on petitions, makes the observation that ‘1 signatures not affixed to the petition on the date stated therein wilLserve to invalidate the entire petition sheet. (Matter of Collins v. Heffernan, 187 Misc. 165; O’Brien v. Heffernan, N. Y. L. J., August 10, 1951, Gold, J., p. 234, col. 3.) ”
In Matter of Anderson v. Power (1 A D 2d 603) the Appellate Division, First Department, pointed out that although the amendment to section 135 permits the use of the presently used unsworn statement by a subscribing witness in lieu of an affidavit, nevertheless, it is ‘ ‘ under the same penalties for falsehood as if duly sworn. Such a statement is a solemn, formal act that must comply with the statute.”
It is therefore a serious offense when a subscribing witness signs such a statement, equivalent to an affidavit, when he knows full well that the signer did not sign in his presence or before him. It is similar to a situation where a notary signs a statement that the signer has acknowledged his signature before him. That notary’s act when untrue constitutes fraud and deceit and is punishable as a misdemeanor under section 1820-a of the Penal Law; if the notary is a lawyer it can lead to disbarment. (Matter of Brooklyn Bar Assn. 225 App. Div. 680.)
A subscribing witness is charged with knowledge of the petition’s purport and importance and that others will rely on the truthfulness of his representations and be deceived thereby. *890 Such an act may not be treated lightly even in the heat of a primary campaign. A most liberal construction of section 135 cannot pardon any such misrepresentations.
At page 139 of the afore-mentioned “ New York Election' Law ” it is stated: ‘ ‘ The principle of an honest authentication lies at the very foundation of our electoral process. Persons who .sign petitions must do so in the presence of the subscribing witness. The failure to conform to this rule renders the petition invalid.” And at page 36 of his 1954 Supplement, the author states: 1‘ Thus, a witness who swears falsely to a petition sheet, in the absence of any testimony by him, creates the danger of a declaration of invalidity as to all sheets subscribed by him. The principle of Falsus in uno — Falsus in omnibus was applied. Re: Burns-Sullivan (N. Y. L. J., Aug. 15,1951, Hill, J., affd. 278 App. Div. 1023, 303 N. Y. 601).”
The afore-mentioned 23 subscribing witnesses had certified 214 sheets with a total of 1,928 signatures. On checking these sheets against the specifications of the Board of Elections, the court found that 869 of those signatures were included in the 3,016 which the board had invalidated. The court now invalidates the remaining 1,059 names on those sheets of those 23 subscribing witnesses.
At the end of the hearing the petitioner supplied the court with a list of 48 pages upon which “ ES ”, the initials of Evelyn Strum, appeared at different places. A copy of that list was since delivered to the counsel for the candidate. The court checked those pages and found those corrections. The court also discovered that 10 of those pages were signed by subscribing witnesses who are in the group of 23 referred to above whose credibility was otherwise destroyed by their own testimony or the uncontradicted testimony of others. To avoid duplication, of invalidations the court in making its tabulation has disregarded those 10 sheets because they are included in the 1,059 invalidations mentioned above. The remaining 38 included 339 signatures. Of that number 193 had been invalidated by the Board of Elections. The remaining 146 are now stricken by the court on the strength of the testimony of Evelyn Strum and other testimony in reference to alterations made on pages after they were signed by the subscribing witness.
The afore-mentioned 1,059 and 146 invalidated signatures, totaling 1,205, when added to the 3,016 invalidated by the Board of Elections, make a total of 4,221, which leaves less than the required 2,500 signatures. However, this court is not going to assrpne in the light of the proofs submitted by the petitioners *891 that even those remaining signatures are valid. On the contrary, this whole petition is so permeated with irregularities that the court is convinced that if sufficient time was available many more invalid signatures would be discovered.
This ease is similar to that of Matter of Burns (Sullivan) (199 Misc. 1005, supra). There the Court of Appeals affirmed without opinion (303 N. Y. 601) but it is significant that in its summary of the facts the Court of Appeals (pp. 602-603) said in part: ‘ ‘ There was evidence that, on 256 sheets containing 1,310 .signatures on the designating petition, some of the subscribing witnesses had not been present when the signatures were -obtained; that some subscribing witnesses had not appeared before a notary public, and that the subscribing witness or his name had not been known to the signer, all of which was alleged to be in violation of section 135 of the Election Law. There was, however, additional evidence that the same subscribing witnesses against whom this direct evidence had been given had purportedly obtained and subscribed 311 additional sheets containing 1,489 additional signatures. No direct evidence was offered by petitioner in respect of the illegality of these signatures or the authentication thereof. Special Term said: ‘ The court finds from the uncontradicted testimony that 256 sheets containing 1,310 names are invalid. * * * In the absence of any testimony, I find that all of the designating petitions signed by the subscribing witnesses directly attacked amounting to an additional 311 sheets, containing an additional 1,489 signatures, are also invalid. ’ Appellant argued in the Court of Appeals that, since no proof had been offered by petitioner concerning the signatures and attestations of 311 of the sheets containing 1,489 signatures, the declaration that such sheets were invalid was error. Petitioner argued that all the sheets signed and procured by subscribing witnesses against whom evidence had been offered showing that on 256 sheets their authentication had been illegal had been properly held to be invalid since the evidence indicated that such subscribing witnesses were totally discredited and unworthy of belief.”
The court is mindful that in Matter of Johnson v. Westall (208 Misc. 360) the trial court forgave the subscribing witnesses for misrepresentations and held the other signatures to be valid, using this language (p. 363): “ Because of this irregularity, it is urged that the petitions as to these two candidates should be held invalid in their entirety. These candidates testified before this court. They were frank and straightforward. They specified the names of all those persons who had appeared and signed *892 before them and they readily acknowledged that the remaining signatories had neither appeared nor signed before them. Nearly all of these last-mentioned persons were subpoenaed and they stated that they had in fact signed these petitions and that they knew the two afore-mentioned candidates. There was no proof and in fact no claim that any of the signatures on the subject petitions were forged. There is no question but that in certifying to signatures of persons who did not appear and sign the petitions before them, these candidates were in error.” However, this court feels that the rule should not be extended beyond the facts of that case. In the case at bar none of the other signers in the petitions of these subscribing witnesses whose credibility was put at issue was subpoenaed by the respondents. No one was called by the respondent to testify that he did actually sign.
It must be borne in mind that the Johnson case involved a petition requiring but 33 valid signatures in one district, 10 in another, and 24 in the third, a total of 67. Here we have a county-wide office requiring 2,500 signatures. Here we also have a time element which the court must consider. The law allows a very limited time for the checking of such petitions by opposing candidates. The Board of Elections ruled on August 25, 1959 that 3,016 of the original 6,682 names were invalid for various reasons. This proceeding to invalidate the other signatures came on before this court two days later, at which time the testimony of witnesses was begun. It stands to reason that when thousands of signatures are involved, there is insufficient time for every signer to be interrogated by those opposing the candidate to ascertain if he or she did actually sign the petition in compliance with the law, or even to interview every subscribing witness. It follows therefore as a practical matter that the court may weigh the credibility of the subscribing witnesses who were directly attacked as to all of their alleged signers; and where the court finds misrepresentations in numerous instances, as it finds here, and nothing is offered in rebuttal, it may well indulge in the presumption that there were many other misrepresentations and irregularities which time did not permit to be uncovered.
In the case at bar the candidate, a middle-aged lawyer seeking high judicial office, must be held to the highest degree of veracity. These blank petition sheets were distributed by him personally to relatives and friends. He was obligated to instruct them as to what to do and what not to do. They were returned to him at his home or his campaign headquarters where he was in constant attendance. There, assisted by a small group of rela *893 lives and friends, he scrutinized and processed these sheets. There he had opportunity to check for forgeries, alterations, duplications and irregularities, and to strike them.
In Matter of Weisberger v. Cohen (22 N. Y. S. 2d 1011, affd. 260 App. Div. 392) it was held that where a candidate actively aided, abetted and participated in the presentment of forged petitions he forfeits his right to a place on the ballot and the entire petition is invalid, irrespective of the presence of the required number of valid signatures.
We have a similar pattern here and that same rule should be applied. It is all quite obvious that the candidate elected to submit a petition upon which he knew or had every reason to know were many, many signatures which were invalid for various reasons, as witness that fact that the Board of Elections rejected 3,016, or 45%, for defects apparent on its inspection. He let all of them go in, probably with tongue in cheek, figuring that some of the defects might go undetected. Therefore by his own act he has forfeited his right to a place on the ballot.
Even if there were more than 2,500 unchallenged signatures left, the court under the circumstances would still hold the petition invalid.
The respondent’s designating petition is held invalid. The respondent’s motion to dismiss the petition'for insufficiency is denied.
The hearing on the cross motion of the respondent to validate the 3,016 signatures which were invalidated by the Board of Elections shall be held before me at Trial Term, Part I, on Thursday, September 3, 1959 at 2:00 p.m.