In the Matter of RAYMOND N. HAAS et al., Appellants, v. GEORGE B. COSTIGAN et al., Respondents.—

The nominating petition contains 1,431 signatures. The Special Term struck out 502 of such signatures, leaving a balance of 929. This is 367 more

than the 562 valid signatures concededly needed for the nomination. The elimination of the 502 signatures was due to various gross irregularities and fraudulent practices, to wit: to nongenuine or false signatures, duplication of signatures, nonregistration as voters, incorrect names and addresses, the witnessing by the subscribing witnesses of their own signatures, and the signing of a prior petition of the Democratic party nominating the same seven respondents as candidates of that party for the same public offices. The number of nongenuine or false signatures was 82. About half (642 to be exact) of the 1,431 signatures on the petition were obtained by the following 14 subscribing witnesses: Salzberg, Bender, Saul, Soto, Peck, Schultz, Roche, Dorman, Oshnir, Green, Opolinsky, Saks, Bohin and Thommasson. Of the 642 signatures attested by them on 34 petition sheets, the Special Term properly held 244 to be invalid for the reasons mentioned, including particularly the nongenuine or false signatures. It held to be valid, however, the remaining 398 of the 642 signatures. In our opinion, the remaining 398 signatures, that is, all the signatures on the 34 petition sheets attested by these subscribing witnesses, must be held to be invalid for the following reasons: We find that these 34 petition sheets were rife either with irregularities or with fraud or with fraudulent practices. The six petition sheets of the subscribing witness Thommasson are clear illustrations of the fraud and the irregularities which prevailed. The signing of another's name, even if the other be a friend, a relative or a spouse, and the authentication of such false signatures by the subscribing witnesses who must have known that the signatures were false, constituted a gross fraud. And such fraud cannot be tempered or rendered innocuous: (a) by the forger's specious unsupported assertion that the false signature was authorized by the person whose name he inscribed; or (b) by the fact that such forgery involved only a few names on most of the 34 sheets. Under such circumstances, with so vulnerable a petition and with proof of such gross irregularities and fraudulent practices as to the *244 specific signatures* on the 34 sheets attested by these subscribing witnesses, it becomes the moral and the legal duty of the respondents, the challenged candidates, *even in the absence of a subpœna,* to produce the subscribing witnesses who must be presumed to be under their control. Respondents' failure so to do justifies a conclusion adverse to them with respect to the remaining 398 signatures on such petition sheets (*Matter of Burns* [*Sullivan*], 199 Misc. 1005, affd. 278 App. Div. 1023, affd. 303 N. Y. 601; *Matter of Bloom* v. *Power,* 21 Misc 2d 885, 889–892, affd. 9 A D 626; cf. *Matter of Lefkowitz* v. *Cohen,* 286 N. Y. 499, 502). There is another even more important reason rooted in public policy which requires the invalidation of all the signatures obtained by these 14 subscribing witnesses. Although they had been duly subpœnaed by petitioners to appear upon the trial on October 9, 1961, they deliberately abstained from appearing. On October 9, again on October 11, and again on October 13, the Special Term Justice directed respondents' attorney to produce them. The court's directions too went unheeded; none of them appeared. This court cannot shut its eyes to the practical realities of practical politics. These 14 witnesses were all closely affiliated with the respondents as political co-workers in a concerted drive to obtain respondents' nomination and election to the public offices to which they aspired. From this undeniable fact it must necessarily follow that it was due to the concerted efforts of all of them that such witnesses deliberately disobeyed the court's subpœna and the court's thrice repeated direction. The net result was to thwart petitioners in their attempt to establish fully or properly all the allegations of their petition and to make the trial largely an idle ceremony. Of course, petitioners could have moved to punish these recalcitrant witnesses for contempt of court. But with the limited time available for the hearing and disposition

of election proceedings and with the delay incident to serving them with contempt citations, the remedy of punishment for contempt usually becomes a wasteful academic gesture. Under all the circumstances, where fraudulent practices and gross irregularities pervade the petition sheets attested by subscribing witnesses, public policy requires that such sheets be disregarded in their entirety if the witnesses refuse to appear and to testify, especially after the explicit direction of the court. The courts should not favor or reward prospective candidates who seek to stultify the administration of justice by refusing to produce witnesses subject to their control. The result here reached is analogous to the penalty of striking out a party's pleading for his failure to appear upon an examination before trial pursuant to a subpœna served upon him or his attorney (Civ. Prac. Act, § 299). Hence, if all signatures on the 34 petition sheets attested by these 14 intransigent witnesses be disregarded, respondents have 31 less than the 562 required valid signatures, and their nominating petition must be annulled. Beldock, Christ, Brennan and Pette, JJ., concur; Nolan, P. J., dissents and votes to affirm.