In the Matter of CARMINE G. DESAPIO, Appellant, *v.* EDWARD I. KOCH, Respondent, and JAMES M. POWER et al., Constituting the Board of Elections of the City of New York, Respondents.

First Department, March 19, 1964.

*James J. Leff* of counsel (*Arthur Karger* and *Moses L. Kove* with him on the brief), for appellant.

*Stanley Geller* of counsel (*Lester Evens, Leonard H. Sandler* and *Arnold Weiss* with him on the brief; *Butler, Jablow & Geller,* attorneys), for Edward I. Koch, respondent.

BOTEIN, P. J.  In the 1963 Democratic primary election for male leader of the First Assembly District, Part A, New York County, the rival candidates were appellant DeSapio and respondent Koch.  The official canvass recorded the election of Koch by 41 votes out of a total of more than 9,000 cast. DeSapio has brought this proceeding under subdivision 2 of section 330 of the Election Law, seeking an order directing the holding of a new primary election for the party position involved.  After extended and comprehensive hearings, Special Term dismissed DeSapio's petition.

A new type of voting machine was used for the first time in this primary election.  It was equipped with a single public counter, which reflected the aggregate of the votes cast in both the Democratic and Republican primaries.  Before admitting a voter inside the curtain shielding the machine from view, an inspector of election regulated a device known as a party selector.  This engaged the machine so that a voter could vote only in the primary of his party enrollment.

Two identifiable groups of votes are contested specifically by DeSapio.  It is undisputed that 45 persons voted in the Democratic primary who did not sign the registration poll records, as provided by the Election Law (§§ 201, 412, 413) and the State Constitution (art. II, § 7).  He also contends that 24 additional persons voted illegally because they were not enrolled Democrats or did not reside within the district. The Justice at Special Term sustained objections to 15 votes in

the first category, and 20 in the second — 35 in all. We are in substantial agreement with his painstaking and well-reasoned holdings on objections to specified votes; at the most three more objections might have been sustained.

This was a close election. To repeat, the official canvass reported Koch the winner by 41 votes. Sixty-five specific votes were contested by DeSapio. Special Term sustained 35 of his objections. This does not mean, of course, that Koch's margin of victory was thereby cut to 6 votes, since no one except the voters themselves knows for whom the 35 invalid votes were cast (*Matter of Badillo* v. *Santangelo,* 15 A D 2d 341).

Close elections usually leave in their wake nagging suspicions that perhaps the true choice of the electorate was not declared the winner. But all elections do not result in thumping pluralities that give reassuring evidence of the clear-cut mandate of the People; and there is no law in this State providing that elections of a specified closeness must be rerun. The margin of victory, no matter how narrow, in and of itself cannot justify upsetting an election (*Matter of McGuinness* v. *DeSapio,* 9 A D 2d 65). There must at least be a showing that would justify a reasonable belief that the challenged irregularity may have accounted for the victor's plurality. Absent such a showing there must be a finality to closely fought elections just as in closely fought lawsuits.

When an election is as close as this one was, the first impulse of the defeated candidate is to try to bowl over the slight difference in recorded votes through an exercise in mathematics. If the number of invalid votes were three times the 35 found by Special Term, that could warrant setting aside this election; but on simple arithmetic alone, 35 invalid votes cannot erase a plurality of 41 votes. On the other hand, it cannot be gainsaid that the narrow margin of victory is a most influential element in the complex of factors that must be considered in determining whether the recorded result truly reflected who was rightfully elected.

There will be elections in which few if any votes can be identified and invalidated as conclusively as those challenged in this proceeding. Such elections may be conducted so badly that even though illegality of specific votes cannot be attributed to the misconduct, still it must be found that the resultant mischief held such potential for changing the result that every dictate of fairness and protection of the voters' franchise demands a new election. In such a situation one must look to the conduct and climate of the election as a whole.

For example, it seems to me that where widespread fraud is proven, the specific disclosure of a clutch of illegal votes aggregating a substantial proportion of the winning plurality might support a conclusion that undiscovered fraud accounted for the balance of that plurality (cf. *Matter of Bloom* v. *Power,* 21 Misc 2d 885, 891, 892, affd. 9 A D 2d 626, affd. 6 N Y 2d 1001; *Matter of Burns* [*Sullivan*], 303 N. Y. 601; *Matter of Haas* v. *Costigan,* 14 A D 2d 809, affd. 10 N Y 2d 889; *Matter of Hooper* v. *Power,* 17 A D 2d 816, affd. 12 N Y 2d 764; *Matter of Friedman,* 238 App. Div. 341, 344; *Matter of Weisberger* v. *Cohen,* 260 App. Div. 392). In this proceeding, however, no claim of fraud has ever been asserted.

Or, in a close contest, the inefficiency or carelessness of the persons conducting the election may cast sufficient doubt on the result to warrant a new election. In this respect an election contest again is not unlike a contest in a court of law. Either may be set aside for prejudicial errors committed by the officials who conduct them; but their responsibility should be measured by the fact that the interested parties are represented by lawyers or election district watchers. Of necessity, lawsuits and elections are to some extent regarded as adversary actions, to be fought hard and cleanly, it is true, but within a dominant self-help philosophy (*Matter of McGuinness* v. *DeSapio, supra,* p. 73).

As would be expected in a bitter primary fight embracing 43 election districts, with over 11,000 persons voting in the two-party contests, and more than 9,000 in the Democratic primary, the election officials made mistakes. The high ratio of identified illegal votes to Koch's plurality reduces, of course, his margin for additional error of a more problematical nature. We address ourselves, therefore, to the question as to whether the entire pattern of the election would reasonably be found to have so affected the result as to require a new election, according to the foregoing guidelines.

As previously stated, 45 persons who did not sign the registration cards were permitted to vote. This indicates neglect of duty by the election officials; but a contained kind of neglect that could not affect more than the 45 votes specifically identified as cast by nonsigners. Had other nonsigners been permitted to vote, those irregularities would inexorably have been revealed by the comparisons made between the signed registration cards and the public counter tally. We may not speculate that because election officials were revealed to be negligent in one circumscribed area they must have been negligent to

the detriment of DeSapio in other areas unknown and unmentioned.

The same must be said of a similarly limited group of irregularities involving the 24 persons who voted illegally in the Democratic primary because they were not enrolled in the Democratic party, or because they did not reside within the district on primary day and were therefore ineligible to vote.

There was only one contest in the Republican primary — for the county-wide office of Councilman-at-Large. This engendered comparatively little of the local fierceness and bitterness of the Democratic primary. Contrary to the experience in the Democratic primary, in which it will be recalled 45 more persons voted than signed the registration records, 23 less persons voted in the Republican primary than signed the records. DeSapio claims it must be inferred that these 23 Republicans voted illegally in the Democratic primary. In such event, however, these votes would be merged into the previously mentioned 45 votes in the Democratic primary that were in excess of the signatures in the registration records. Special Term properly rejected this contention as too speculative, noting that some of the discrepancy might have resulted from voters leaving the polling place without voting.

We now consider another group of irregularities. They involve a large block of votes, but there is just no basis for estimating, with any degree of reliability, that invalid votes resulted from these omissions of the election officials.

The Board of Elections, in accordance with subdivision 7 of section 242-a of the Election Law, furnished the local Boards of Inspectors with public counter cards. These cards are designed to provide a link of communication between the inspectors who procure the signature of the voter to the registration record and the inspectors in charge of the voting booth, so that a person may vote only in the primary of the party in which he is enrolled. The registration book inspectors were required to insert the name and public counter number of each voter on these cards, after he had signed the registration record. Cards colored green were given voters eligible to vote in the Democratic primary and cherry-colored ones for the Republican primary. The voting booth inspectors collected the public counter cards from the voters and adjusted the party selector device so that they could vote only in the appropriate primary. The Boards of Inspectors were instructed to return the public counter cards to the Board of Elections at the close of primary day. In four election districts the Boards of Inspectors failed to return the public counter cards and they

were evidently destroyed or thrown away. There were about 1,100 such cards — representing about 10% of the total primary vote.

DeSapio argues that a number of ineligible persons may have voted in the Democratic primary in the four election districts that did not return the public counter cards. The returns for those districts refute this contention. Nine hundred seventy-seven persons signed the registration records who were eligible to vote in the Democratic primary, and 941 actually voted in that primary. One hundred forty-one entitled to vote in the Republican primary signed the registration records and 139 did in fact vote in that primary. These figures give scant comfort to the appellant in this area. The differential of 36 eligible Democrats who refrained from voting in these four districts is unexplained; and in any event, it is difficult to see how the availability of the green cards would have shed any light on the discrepancy.

Finally, Special Term sustained the validity of 27 votes cast in the Democratic primary by voters who did not sign the registration records. These 27 votes were of course included in the afore-mentioned excess of 45 votes in the Democratic primary over and above the number of eligible voters who signed the registration records. Special Term overruled DeSapio's objections to the 27 disputed votes, essentially upon impressive testimony of persons that they had voted without signing the registration records and upon production of green public counter cards bearing their names. Had these 27 votes been held illegal, DeSapio would have established the invalidity of at least 62, possibly 65 specific votes in the Democratic primary election.

But even if all these votes had been held illegal, 53 of them must have been cast for Koch to have changed the result of the election. In an election so close and concededly free from fraud, it is highly unlikely that Koch received 53 out of those 65 votes (*Matter of Badillo* v. *Santangelo,* 15 A D 2d 341, *supra*).

*Matter of Branagan* v. *Todd* (19 A D 2d 337, affd. 13 N Y 2d 888), as we construe it, did not turn starkly on the illegality of the 47 votes cast on one machine in a Democratic primary in excess of the number of Democratic voters who voted in that election district. Rather, the irregularities were found to have resulted from "the improper functioning of the voting machine" (p. 339), and by implication related to all the votes registered by that machine. Since the petitioner in that case enjoyed a clear lead on the computation of votes cast in the remainder of the city which was offset by the tabulation of

votes on the defective machine, no mathematical exercise was required to hold that if the machine had functioned properly there was a reasonable likelihood the petitioner's lead might not have been destroyed.

DeSapio's major thrust upon this appeal is that the State Constitution and implementing legislation mandate as a condition precedent to participation in an election that the person presenting himself to vote sign his name on the registration poll record; and that the court cannot relieve a voter of so unequivocal a requirement to sign the registration record. In rejecting this contention Special Term relied upon the 1938 holding of the Appellate Division, Second Department, in *Matter of Moritt* v. *Cohen* (255 App. Div. 804, 805), which held among other things that "the oversight of the inspectors of election in not requiring them to sign should not be visited upon voters otherwise qualified." All of us except Mr. Justice RABIN are disposed to follow this holding, although we are mindful of the fact that in affirming the Court of Appeals evidently found it unnecessary to reach this aspect of the Appellate Division's decision.

In summary, then, the specifically voided votes are not in themselves sufficient in number to warrant setting aside the election, and the evidence of other irregularities does not in our opinion offer the potential for invalidating additional votes. Special Term's disposition should therefore be affirmed, with costs.

RABIN, J. (dissenting). A vote that should not have been cast in an election is a vote that should not be counted. The majority, in affirming the decision of Special Term, in effect approved the counting of such votes. It is primarily for that reason that I register my dissent and vote to set aside the election and to direct that a new primary election be held.

It is my position that the votes cast by those voters who had not signed the registration cards were votes cast in violation of the constitutionally mandated section 413 of the Election Law and thus should not have been counted.

In this Democratic party primary election, where over 9,000 votes were cast, the Board of Elections declared respondent Koch to be the winner by a margin of only 41 votes. After declaring 35 votes to be invalid, Special Term found no reason to disturb the result of the election — and of course, with that finding, could not do so, even assuming that the invalid votes had all been cast for respondent, Koch.

It is my view that in addition to the 35 votes found to be invalid by Special Term, 27 votes cast by those who failed to sign the registration cards should also have been declared invalid. I might add that the vote cast by a voter who was not enrolled in any party and another by a voter who concededly was a member of the Liberal party, should likewise have been declared invalid. That results in a total of at least 64 invalid votes rather than only 35 — a result which puts in doubt the propriety of declaring Koch the victor.

In the circumstances, therefore, I conclude that the election was "characterized by such * * * irregularities as to render impossible a determination as to who rightfully was * * * elected" (Election Law, § 330, subd. 2) and it should be set aside and a new election ordered.

With respect to the votes that were cast by those who had failed to sign the register, the pertinent constitutional and statutory provisions are as follows:

New York State Constitution (art. II, § 7):

" [Manner of voting; identification of voters.]

" All elections by the citizens * * * shall be by ballot, or by such other method as may be prescribed by law, provided that secrecy in voting be preserved. The legislature shall provide for identification of voters through their signatures in all cases where personal registration is required and shall also provide for the signatures, at the time of voting, of all persons voting in person by ballot or voting machine, whether or not they have registered in person, save only in cases of illiteracy or physical disability."

Election Law (§ 413):

" Signature identification of voters. 1. A person who presents himself to vote and is allowed to vote, shall be required before voting, * * * to sign his name on the back of his registration poll record on the last line of the space reserved for his signature at the time of election * * *. The two inspectors in charge shall satisfy themselves by a comparison of this signature with his registration signature * * * that he is the person registered. If they are so satisfied they shall enter the other information required * * * and shall permit the applicant to vote."

While apparently recognizing the impropriety of permitting persons to vote without such persons having signed the registration cards, this court, nonetheless, followed the decision of the Appellate Division, Second Department, in *Matter of Moritt*

v. *Cohen* (255 App. Div. 804). That case held that such omissions were mere irregularities and not fatal to the votes cast where the respective voters were in fact otherwise qualified.[1] I do not agree.

One of the prime concerns in the conduct of elections is the prevention and detection of fraud. To minimize the possibility of such fraud, strict rules have been provided by statute which set forth guidelines for the conduct of elections.[2] In my opinion many of these requirements — and particularly the requirement of signature identification — have a dual purpose. Of course, they are designed to detect fraud. But it is also their further function to discourage attempts at, and render difficult the perpetration of such fraud. To fully effectuate this second purpose strict compliance with the statutory requirements governing the conduct of elections is an absolute necessity.

However, the *Moritt* decision holds that the failure to sign the register when voting is merely a correctible irregularity. I strongly disagree with such a conclusion. When and how could such an irregularity be corrected? Apparently only in court in the event the election is contested. Votes were not intended to be counted and results of an election ascertained in court. It is contemplated that such function be performed in the appropriate polling place. Particularly is it undesirable to have the outcome of elections depend upon testimony of witnesses whose credibility has to be evaluated. The object of the requirement for signature at the time of voting is to obviate the necessity of such a course.

It appears to me that the situation here presented is not unlike that where an unregistered voter is permitted to vote. Would we say that the failure to register was a mere irregularity and permit the vote to stand if the voter subsequently testifies that he was indeed qualified to vote by reason of age, residence, citizenship, etc.? I think it is clear that we would not. Would we reinstate a designating petition where the subscribing witness had failed to sign the required statement at the bottom of such petition if it were subsequently proven at a hearing that the witness had in fact obtained the signatures and was otherwise qualified to do so? I think not.

---

1. The Court of Appeals affirmed the order of the Appellate Division (279 N. Y. 617). However, the affirmance rested upon other grounds and the issue with which we are here concerned was concededly not passed upon.

2. It should be noted that such strict guidelines are also applicable to pre-election procedures such as the form of designating petitions (Election Law, § 135), acceptance or declination of designations or nominations (Election Law, § 139) and registration procedures (Election Law, § 150 *et seq.*).

My conclusion is that the failure to sign the registration cards invalidated the votes cast by those who failed to sign. Such omission was not a mere irregularity which could be corrected through a court contest. The failure to sign was fatal.

In any event, assuming that I could agree with the majority in the *Moritt* case as of the time that decision was made, subsequent developments would require that I now reach a contrary result. Similarly, I believe that the divided *Moritt* court (two of the Justices were in dissent) would be required to do likewise.

At the time of the *Moritt* decision in 1938 the requirement that a voter sign his name prior to voting stemmed from the then sections 202 and 207 of the Election Law. Those sections had been adopted without any constitutional mandate. Thereafter, at the 1938 Constitutional Convention, section 7 of artice II of the Constitution was amended so as to direct the Legislature to enact legislation providing for the " identification of voters through their signatures ". Although it would seem — as has been held by the Attorney-General (1939 Atty. Gen. 226) — that such constitutional provision is self-executing, the Legislature did enact such legislation pursuant to such mandate (presently Election Law, § 413). While it is true that the pre-constitutional convention statute and the post-constitutional convention statute are essentially similar in substance with respect to the question of signature identification, I do not believe that their impact is likewise similar. It would appear to me that a constitutionally mandated statute must perforce be given more weight than a statute passed merely within the confines of the Legislature's discretion.

The second element which has changed since the *Moritt* decision is the fact that we now have permanent personal registration. Under this method of registration there is much greater opportunity, for one so inclined, to perpetrate fraud in connection with the voting process. Thus, more than ever, it is now essential that there be compliance with the signature requirement of section 413 of the Election Law.

It is argued — and so stated in the *Moritt* memorandum opinion — that it would be unfair to penalize a voter for the omission of the election official. The simple answer to that is that the sanction is not directed against the voter. It is directed against the vote. It is no different than if we disregard a signature on a nominating petition where the person taking such signature fails to properly subscribe the petition as a witness. The Election Law contains many provisions which result in the invalidation of votes despite the absence of fault on the part of the voter. Indeed, in order to have regular and orderly elec-

tions, free of fraud, it may well be that we must adopt the position that all voters are deemed to be aware of what is required of them in order to properly and validly cast their votes. In any event, the voters who failed to sign the registration cards in this election will not be penalized if it be set aside since they will have another opportunity to have their votes registered — this time in accordance with the law.

The decision of the majority in effect permits of what I consider to be a most undesirable result. It would permit elections to be decided not by what occurs within the confines of the voting booth but rather by what occurs on a witness chair in a courtroom and upon findings as imprecise as the credibility of witnesses. Permitting elections to be decided upon such a basis is hardly conducive to encouraging the confidence of the public in the elective process.

Having concluded that there was at least a total of 64 invalid votes cast in the primary election, I find such amount to be sufficient to require that a new election be held. Subdivision 2 of section 330 of the Election Law was intended to provide for the cancellation of "unlawful proceedings which have resulted or may have resulted in the declaration of a false result" (*Matter of Coughlin,* 137 App. Div. 283, 285, affd. 198 N. Y. 613; *Matter of McGuinness* v. *DeSapio,* 9 A D 2d 65). To enable the court to take such action it is not necessary that it be demonstrated that the result was in fact affected by the invalid votes. It is sufficient to show "that the result *could* have been affected thereby" (*Matter of McGuinness* v. *DeSapio, supra,* p. 71). Where it is impossible to determine "who rightfully was * * * elected", a new election is required (Election Law, § 330, subd. 2). I conclude that in the circumstances of this case, the casting of 64 invalid votes "could" have affected the result and we cannot determine who "rightfully was * * * elected". In reaching such conclusion I am not unmindful of the limitation imposed by *Matter of Badillo* v. *Santangelo* (15 A D 2d 341) upon the power of the court to set aside an election. I find the instant case to be substantially different factually from the *Badillo* case where the facts were such as allowed for the determination that there was only a "mere mathematical possibility that the results could have been changed" and that the "probabilities all combine to repel any such conclusion" (p. 342). With respect to the instant case, however, it must be said that it is quite possible — as distinguished from a "mere mathematical possibility" — that the result may have been affected by the invalid votes cast. (See *Matter of Branagan* v.

*Todd,* 19 A D 2d 337, affd. 13 N Y 2d 888.) [3] Any other conclusion would have to be based upon mere speculation. We may not depend upon mere speculation to refuse to set aside such an election where it is clear that the result was improperly reached.

It is of no consequence that actual fraud is not claimed or found here. Neither was there fraud claimed, nor found, in the *Branagan* case where the election was set aside because the irregularities in that election were sufficient to the point that it was " impossible to determine who rightfully was nominated " (p. 339). Where, as here, the result of an election is not free from uncertainty and doubt, by reason of the counting of a crucial number of invalid votes, the election must be set aside whether or not there be fraud involved. The candidates, and indeed the public, are entitled to an election result which reflects the will of the electorate. Particularly should care be taken where the result is extremely close.

Adding to the 35 votes invalidated by Special Term the invalid 27 votes cast without signatures and the 2 votes improperly counted, makes a total of 64 votes that should have been disregarded. In this close election, with such a total of invalid votes, it is " impossible to determine who rightfully was * * * elected ".

Inasmuch as I find that 64 votes were invalidly cast, and since I am of the opinion that such votes are sufficient of themselves to require that the election be set aside, I need not consider the other alleged irregularities asserted by the appellant.

In the light of the above I vote to reverse the order of Special Term appealed from and would set aside the election and direct that a new election be held.

BREITEL, McNALLY and EAGER, JJ., concur with BOTEIN, P. J.; RABIN, J., dissents and votes to reverse, in opinion.

Order, entered on October 31, 1963, affirmed, with $20 costs and disbursements to respondent Edward I. Koch.

---

3. While I do not believe that cases of this type should be determined merely by mathematical computation, it is interesting to note that a new election was ordered in *Matter of Branagan* where 40 of the 47 invalid votes — 85% — would have had to have been cast for Branagan's opponent in order to have changed the final result — a greater percentage than would be required to change the result in this case.