OPINION OF THE COURT
James H. Shaw, Jr., J.
This is a proceeding brought pursuant to article 16 of the Election Law to declare invalid the designating petition purporting to nominate Molly Klapper for the public office of *52 Judge of the Civil Court for the Fifth Municipal District in the September 14, 1999 primary.
While, as a general rule, a candidate’s designating petition will be invalidated on the ground that some signatures have been fraudulently obtained “only if there is a showing that the entire designating petition is ‘permeated with fraud’ (Matter of Ferraro v McNab, 60 NY2d 601, 603; see, Matter of Proskin v May, 40 NY2d 829, 830; Matter of Aronson v Power, 22 NY2d 759, 760), when the candidate herself has participated in the fraud, the petition should be invalidated even if there is a sufficient number of valid signatures independent of those fraudulently procured” (Matter of MacDougall v Board of Elections, 133 AD2d 198, citing Matter of Flower v D'Apice, 104 AD2d 578, affd 63 NY2d 715; Matter of Layden v Gargiulo, 77 AD2d 933, 934).
The record, as amplified, demonstrates that there were many instances of “irregularities, improprieties and fraudulent practices” which permeated the designating petition (see, Matter of Mercorella v Benza, 37 NY2d 792, 793). Most significant of these improprieties is evinced by the testimony of Sharon Staton, a commissioner of deeds whom the court previously found took 274 otherwise valid signatures in violation of section 17-122 of the Election Law, which prohibits payment to signature gatherers on a per-signature basis, as directed by the then-campaign manager, Allen Bortnick. The court finds that most of Mr. Bortnick’s testimony at the hearing was patently incredible.
In light of Ms. Staton’s credible testimony that “we” (Bortnick’s regular signature-gathering crew) were told by Bortnick that the “going rate” for signatures was $1.75, it was then incumbent upon respondent to refute this testimony. Respondent could have done so in a number of ways. She could have produced other members of Bortnick’s “crew” to testify that they were indeed paid by the hour as insisted by Bortnick. Despite the service of subpoenas upon those persons and the direction of the court to appear none were produced. Mr. Bort-nick could have produced the payroll records he kept to pay his “crew” and establish through this documentary evidence that the notaries public and commissioners of deeds were paid in accordance with the Election Law. Incredibly, these records were among those Bortnick claims were destroyed at a car wash and subsequently thrown out. Notwithstanding the destruction of these records under questionable circumstances, respondent could have nonetheless reconstructed the records *53 in part by the production of records and testimony of the campaign treasurer (and husband of the candidate), Jacob Klap-per. In spite of service upon him of a subpoena, and the direction of the court to appear, Jacob Klapper did not appear in court.
Under these circumstances, the court must infer that each such notary, commissioner of deeds and/or campaign official would have testified adverse to respondent’s position, and that the records destroyed would have supported petitioner’s contentions (see, Matter of Haas v Costigan, 14 AD2d 809, affd 10 NY2d 889; see also, Matter of Haskell v Gargiulo, 51 NY2d 747, 748; Matter of Martinez v Olmedo, 153 AD2d 720, lv denied 74 NY2d 609). The court thus invalidates the signatures taken by Staton, Bortnick, Elsie Ortiz, Beverly Brown, Alysande Brown and Veola Glover, totaling approximately 700 signatures, leaving respondent well below the required number of signatures.
The court casts a similar adverse inference with respect to the actions of the candidate herself. In light of the testimony and affidavits submitted by petitioner in which they established that some signatures taken by the candidate were then notarized by her nephew, Jeffrey Klapper, it was incumbent upon Ms. Klapper to appear and refute the testimony, particularly in the face of service of new subpoenas and the direction by this court to appear.
The court further finds that the petitions contained various additional irregularities as well. For example, it was established by the testimony of petitioner’s handwriting expert that a number of alterations were made to the petition after the pages left the hand of the individual subscribing witnesses/ notaries/commissioners of deeds. Equally troubling is the testimony that established that in some instances alterations were initialed by persons other than the witness to the signature. Although some such alterations may not be “material alterations” under the Election Law, when changes are made under such circumstances, they are done so in violation of the provisions of Election Law § 17-122 (8), and any such signatures should be invalidated (see, Matter of Sheldon v Sperber, 45 NY2d 788).
Finally, the court finds that the candidate was “inextricably intertwined in the petitioning process” and actively involved in the signature-gathering process (see, Villafane v Caban, 104 AD2d 579, 580). With this in mind, inasmuch as the candidate’s “sometime” campaign manager was closely involved with the *54 illegal activity, the candidate should be charged with knowledge of the fraud (see, Matter of Buchanan v Espada, 230 AD2d 676, affd 88 NY2d 973) and the entire petition is tainted (Matter of Flower v D'Apice, 104 AD2d 578, supra; Matter of Layden v Gargiulo, supra, 77 AD2d, at 934). It is, therefore, ordered that the petition herein is granted, and it is further ordered that the respondent Board of Elections of the City of New York shall remove from the ballot for the Fifth Municipal District in the September 14, 1999 primary election the name of Molly Klapper for the public office of Judge of the Civil Court.